## SOUTHERN RY. CO. v. RITCH.

(Circuit Court of Appeals, Fifth Circuit. February 14, 1911.)

### No. 2,135.

**1.** Master and Servant (§ 243*)—Master's Liability for Injury to Servant — Contributory Negligence — Violation of Rules of Railroad Company—Question for Jury.

Civ. Code Ga. 1895, § 2323, as construed by the Supreme Court of the state, gives a railroad employé the right to recover for an injury caused by another employé if himself free from fault or negligence contributing "in any appreciable degree" to his injury, but not otherwise. Plaintiff, a switchman, was performing the duties of a rear brakeman and flagman on a switching train on the main track in defendant's yards at Atlanta, and, while standing on the end sill of the rear car, it was struck by a following train, and he was injured in the collision. The train had been stopped at a station four minutes or more in preparing to make a switch, but the cars were then moving at a speed of six or seven miles an hour. Plaintiff had a red lantern and torpedoes for signaling. A general rule of the company with which he was familiar required every flagman when his train stopped more than three minutes to go back with signals to stop

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

any following train. Plaintiff knew of the following train, which carried employés between different points in the yards, making the trip at stated intervals, and testified that he saw it when half a mile distant, but that, as the track was straight and the engineer could see his red light, he did not think it necessary to go back. *Held*, on the facts, that plaintiff was barred from recovery under the statute as matter of law because of his failure to obey the rule and to exercise ordinary care for his own safety, and that it was error for the court to overrule a motion to direct a verdict for defendant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 759–775; Dec. Dig. § 243.*]

*(Per Shelby, Circuit Judge, Dissenting.)*

2. MASTER AND SERVANT—MASTER'S LIABILITY FOR INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE—GEORGIA RAILROAD STATUTE.

Civ. Code Ga. 1895, § 2323, which provides that if an employé of a railroad company is injured, and the damage was caused by another employé "without fault or negligence on the part of the person injured," his employment shall be no bar to a recovery from the company, as construed by the Supreme Court of the state, by the use of the words "without fault or negligence," places no unusual burden' on the employé who is injured, who is held only to the exercise of ordinary care and diligence, and, to defeat his right of recovery, it' must appear that he failed to exercise such care, and that the failure was a contributing cause to his injury.

3. MASTER AND SERVANT — ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY—CONTRIBUTORY NEGLIGENCE.

The question whether plaintiff in an action by a servant against the master to recover for an injury was chargeable with contributory negligence by failure to exercise "ordinary care" is usually one for the jury, and the court is justified in determining it as matter of law only when the facts are such that all reasonable men must draw the same conclusion from them.

4. MASTER AND SERVANT — ACTION FOR INJURY TO SERVANT — QUESTIONS FOR JURY—CONTRIBUTORY NEGLIGENCE.

The court was not required to hold as matter of law that a plaintiff who was rear brakeman and flagman on a switching train in defendant railroad company's yards, and was injured in a rear-end collision with a following train, was chargeable with contributory negligence because he did not go back and signal the following train when his own train was stopped just prior to the collision, in obedience to a rule of defendant requiring flagmen to do so when their trains were stopped for more than three minutes, where there was evidence tending to show that the rule was not applicable to trains moving within the yard limits and was not so applied in practice, and where it did not appear that plaintiff's train was expected to stop for that length of time, and the time it did stop was shown only by the estimates of the trainmen, which varied from four to ten minutes.

5. MASTER AND SERVANT—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY—CONTRIBUTORY NEGLIGENCE.

Where a plaintiff was injured while performing the duties of rear brakeman and flagman on a switching train in defendant's yards which was moving at a speed of 6 or 7 miles an hour when it was run into by a following train running 25 or 30 miles an hour, he was not chargeable as matter of law with failure to exercise ordinary care to escape injury, which he could only have done by jumping from the train.

In Error to the Circuit Court of the United States for the Northern District of Georgia.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action at law by Clifford H. Ritch against the Southern Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

McDaniel, Alston & Black (Sanders McDaniel, Robert C. Alston, and Eugene R. Black, on the brief), for plaintiff in error. Anderson, Felder, Rountree & Wilson (James L. Anderson and Dan'l W. Rountree, on the brief), for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and TOULMIN, District Judge.

TOULMIN, District Judge. Clifford H. Ritch, the plaintiff below, recovered a judgment against the defendant (plaintiff in error here) in an action for damages on account of personal injuries alleged to have been sustained on December 16, 1908, by reason of a collision in the railway company's yards near Atlanta, Ga., caused by the negligence of the company's agents and employés, and without fault on the part of plaintiff below, and alleging that said injuries could not have been avoided by exercise of ordinary care on his part.

The only question presented by the assignment of errors is whether or not the court below erred in refusing defendant's motion to direct a verdict in its favor, made at the close of the evidence, on the grounds:

"(1) That the evidence fails to show the negligence alleged against this defendant.

"(2) That the evidence shows negligence on the part of plaintiff and shows that plaintiff was himself at fault."

Following are, in substance, the facts shown by the evidence: Ritch was engaged in performing the duties of switchman and flagman in the yards of the Southern Railway Company, near Atlanta, Ga., and on December 16, 1908, about 5 o'clock a. m., under such employment, was on the end sill of a coal car at the rear end of a switching train of 27 cars and engine moving from the "South Yards" to the "Inman Yards" of the company, a distance of five or six miles. Said switching train had stopped, on the main line of the railroad, at or near Howell's Station, which was a mile or more from "Inman Yards," in order to switch these cars to another track, and proceed thence to their destination. The train was so stopped from five to ten minutes; the several witnesses varying as to the exact time. The plaintiff stated that they stopped, but is uncertain as to the time. The conductor of Ritch's train testified that they had to "bleed off the air" from these cars at such stop in order that the cars might roll in at Howell's and that such process consumed from four to six minutes, and the engineer of the train makes it from seven to ten minutes. It was soon after the cars had started to roll in order to make the switch, and while yet on the main line, that another train going in the same direction, called the "Hoodlum" or "Shuttle" train, collided with the rear end of the train on which Ritch was riding, he being on the end sill of the rear car, resulting in the injuries complained of. This Hoodlum train was one operated in the yards on a regular schedule posted by bulletin and known to the employés for the purpose of carrying the latter from one part of the premises to another, as their work required. Its engineer

testified that Ritch's train passed his at Simpson street about 5 o'clock, where his train was standing on the south main line awaiting orders to proceed on the north main line to Inman, the same track and direction that the switching train pursued; that he knew Ritch's train would have to stop at Howell's Station; that the Hoodlum train left Simpson street at 5:03 a. m., following Ritch's train, and struck the latter about one mile farther on at about 5:10 a. m.; that it was a dark and foggy morning, and he did not see this train until within about two car lengths of it; that he was on the look-out approaching Howell's, did not see a red light ahead of him, but did see a white light which he thought was on another track close by; that the track was straight at this point; and that his train had the right of track over the switching train.

The plaintiff, Ritch, testified that he first saw the Hoodlum train when it crossed the Atlanta, Birmingham & Atlantic crossing, he being half a mile ahead of it then, and that he knew it was coming along the track on which his train was, and that his train had to get out of the way; that he could see straight down the track, and that, "I let it run into me, and never knew it was there until it hit me. It was my duty to stay back there." He stated that the rear end of his train was 13 or 14 car lengths from Howell's Station, and had not gotten to that station when hit. When asked, "Why weren't you looking out for this train?" he answered:

"Why, the train was moving and on a perfectly straight track, and nothing in the way to keep the engineer from seeing my light, nothing in the world between us and his tender, and I was just so sure he would stop, knew that he would stop. It was a stop for all trains."

He testified that he also had to look out for signals from the front switchman, and had to couple the engine to his car at the proper time. He stated that he knew rule 99 of the company, which, together with rules 589 and 590, he stated was in force at the time. Said rules were introduced in evidence, and are as follows:

"99. When a train is stopped at an unusual point or is delayed at a regular stop over three minutes, or when it fails to make its schedule time, the flagman must immediately go back with danger signals to stop any train moving in the same direction. * * *"

"589. (In regard to flagman) It is their especial duty to protect the rear of the train in strict accordance with the rules, and they must allow nothing to interfere with the prompt and efficient discharge of this duty.

"590. They must obey the signal from the engineman prescribed by the rules, but must never wait for such signal or for orders from the conductor when their trains need protection."

He further testified that he was furnished with a red light and torpedoes at the time; that—

"I was supposed to take charge and protect the rear of that train, and was given that lantern to do it; but I was not supposed to flag a train there on that straight track. * * * We were not supposed to flag in the yard limits on a straight track. In the yard limits, if my train is standing on a curve, I always step back around to give the man a showing. * * * The rule covers flagging, where he should use the flag when occupying the main line. It does not make any difference between a curve and a straight track. I made the difference myself."

It appeared that Ritch, in his application for employment, obligated himself to study the rules governing employés, and on the trial of this case showed familiarity with the rules applicable to the situation. The evidence showed that Ritch remained on the rear end of his train until hit, and did not comply with the rules as to going back, when his train was previously stopped on the main line and flagging any approaching train.

The general yardmaster of defendant company testified that there was a bulletin (which was in evidence) posted, through his order, in conspicuous places, calling the attention of employés to the schedule and operation of this Hoodlum train; that such train had rights by special instructions over all trains except first class, which were passenger trains, and was so regarded by employés. He stated that the fact that a train was operating in the yards caused no suspension of the rules regarding flagging, and that, although as a matter of practice it was not customary for a flagman to run back the number of telegraph poles mentioned in rule 99, still, by the rules and instructions, under the circumstances shown by this case, the flagman's duty required him to take a red light and go back from the train some distance, and place a torpedo on the track, the whole object being to insure safety; that it was the duty of the flagman to protect the rear of his train, to do which he would take a red light, get down off the end of the train, and go back far enough to save it from collision.

The Code of Georgia of 1895 (vol. 2, § 2323) provides as follows (relative to railroad companies):

"If the person injured is himself an employé of the company, and the damage was caused by another employé, and without fault or negligence on the part of the person injured, his employment by the company shall be no bar by the company to the recovery."

The construction placed upon this provision by the Supreme Court of Georgia has established the rule in that state that, as a condition precedent to a recovery by the injured employé, he himself must be free from fault or negligence contributing "in any appreciable degree" to his injury; but that, if plaintiff's negligence contributes in such degree to his injuries, the statute denies him a right of recovery. Georgia R. & Banking Co. v. Hicks, 95 Ga. 301, 22 S. E. 613; Southern Railway Co. v. Salmon, 132 Ga. 753, 65 S. E. 70; Little v. Southern Railway Co., 120 Ga. 347, 352, 353, 47 S. E. 953, 66 L. R. A. 509, 102 Am. St. Rep. 104.

In the case of Savannah, Florida & Western Ry. Co. v. Folks, 76 Ga. 527, the Supreme Court held:

"Where the undisputed evidence shows that an engineer of a railroad company violated its rules furnished for his government in respect to passing switches and turnouts, and in respect to the speed at which trains should be run, and the precautions to be used by engineers to prevent collisions, and that a collision was occasioned in whole, or at least in large part, from his negligence in this regard, and that such collision caused his death, a recovery by his widow against the railroad for his homicide was contrary to law and unsupported by the evidence, whether or not there was also negligence on the part of the company's employé on the other train with which the collision occurred."

185 F.—46

Also, in the case of Parker v. Georgia Pacific Railway Co., 83 Ga. 539, 10 S. E. 233, it was held that:

"Failure of a railroad employé to extricate himself from a perilous situation brought on by the negligence of a coemployé, when he could do so by the use of ordinary care, will bar his right to recovery."

In the case of Central Railroad Co. v. Lanier, 83 Ga. 592–593, 10 S. E. 280, the Supreme Court, defining the word "fault," states as follows:

"It means that nothing should have been done that ought not to have been done by the party complaining, and that he should not have omitted anything that he ought to have done."

Under the state of facts shown by the record, and the law applicable thereto, there seems to be no doubt but that the collision could have been avoided and Ritch's injuries prevented, had he obeyed the rules prescribed by the company for his government under the conditions shown. It was his manifest duty to have gone back a sufficient distance and flagged the approaching train when his train had stopped on the main line for more than the time allowed by the rules, and thus prevent injury to the company's employés and property, but, failing in this, he could, by the exercise of ordinary care, have escaped from any perilous situation in which he might have been placed, and thus avoided his own injuries.

The rules ignored and violated in this case are not only essential for the protection of the railroad company's property, but are also in the interest and for the protection of the traveling public. If they were better observed, we should hear of fewer rear-end collisions so frequently resulting in loss of lives and personal injuries. The violation of such reasonable and important rules should neither be ignored nor approved by trial courts and juries. We think the court below should have given the general charge in favor of the defendant railway company.

The judgment of the Circuit Court is reversed and the cause remanded, with instructions to grant a new trial.

SHELBY, Circuit Judge (dissenting). The plaintiff (defendant in error here) was a brakeman and flagman on a switch train of the Southern Railway Company. There were 27 cars in the switch train, and he was on the rear car. The train was moving at the rate of six or seven miles an hour. The plaintiff had his lantern with a red light on the end of the rear car. It was very foggy and about 5 o'clock in the morning. Another train belonging to the defendant company, called the "Hoodlum" train, going in the same direction as the switch train at a rate of from 25 to 30 miles an hour, ran into the switch train with great force, derailing the car on which the plaintiff was riding, and causing him permanent injuries by breaking his rib, crushing his foot, and injuring the muscles of his leg. He brought suit for these injuries in a Georgia state court, and the case was removed to the Circuit Court. The defense was based upon the claim, first, that the evidence failed to show the negligence of the defendant; and, sec-

ond, that the evidence showed negligence on the part of the plaintiff that contributed to his injury.

The trial court submitted the case to the jury, and there was verdict and judgment for the plaintiff for $1,500 damages.

The only question in this court is whether or not the Circuit Court erred in refusing to direct a verdict for the defendant.

I find nothing in the opinion of the majority that tends to sustain the defense that the defendant company was not guilty of negligence, or that the question of the defendant's negligence was not proper to be submitted to the jury. It would be difficult to sustain the proposition that the court below should have directed the jury to find that there was no evidence tending to show the negligence of the defendant, for the facts unquestionably tend to show the negligent and reckless running of the Hoodlum train against the switch train, although the red light was on the rear end of the last car of the switch train.

The case, therefore, admittedly turns on the question whether or not the court below should have taken the case from the jury on the defendant's contention that the evidence showed as matter of law that the plaintiff himself was guilty of negligence which contributed to his injury.

The phrase "without fault or negligence," found in section 2322 of the Code of Georgia of 1895, does not put any unusual burden upon the plaintiff. He is not required to exercise extraordinary diligence. The rule of diligence to be exercised by him is "ordinary diligence." Central Railroad Company v. Lanier, 83 Ga. 587, 591, 10 S. E. 279, 280. In Central of Georgia Ry. Co. v. McClifford, 120 Ga. 90, 94, 47 S. E. 590, 592, the court said:

"This court has never held that an employé of a railroad company is bound to exercise extraordinary diligence. On the contrary, it has always held that ordinary diligence is all that is required."

In Southern Railway Company v. Salmon, 132 Ga. 753, 756, 65 S. E. 70, 71, the court held that the fault or negligence referred to in the statute means "negligence operating at the time of the injury, and that any negligence of the employé which does not contribute to his injury will not defeat the action." I find nothing in the Georgia statutes, or in the cases construing them cited in the majority opinion, that indicates that if the defendant company had permitted this case to remain in the state court, that that court on the facts shown by the record would have taken the case from the jury. If, under the law of the state as announced by its courts, the facts had made a case of negligence by the plaintiff as matter of law, the case would probably never have been removed to the federal court.

The last lines of the majority opinion contain the two reasons given for holding that the plaintiff was in fault, and that the court below should have directed a verdict for the defendant: (1) That it was the plaintiff's duty to have gone back a sufficient distance and flagged the train; and (2) that, by the exercise of ordinary care, he could have escaped from his perilous position. To sustain the court's decision that the trial court erred in not directing the verdict, the evidence must sustain one of these propositions without material conflict of evidence or

inference. The circumstances under which a court is justified in directing a verdict on the issue of negligence is well stated by Mr. Justice Lamar in Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 682 (36 L. Ed. 485):

"There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may under different surroundings and circumstances be gross negligence. *The policy of the law has relegated the determination of such questions to the jury under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men under a similar state of affairs.* When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the *facts are such that all reasonable men must draw the same conclusion from them* that the question of negligence is ever considered as one of law for the court." (Italics mine.)

The decision that the plaintiff was guilty of negligence because he failed to flag the train is based on rule 99, copied in the opinion. The trial court would not have been justified in directing the verdict on this rule, for there was evidence tending to show that this rule was not applicable to switch trains within the yard limits, and the accident occurred within the yard limits. The plaintiff, testifying as to the accident, said, "It was all within the yard limits of Atlanta"; and Watts, the yardmaster, testified that "it was entirely inside of the yard limit." There was other evidence to the same effect. The evidence does not show without contradiction that rule 99 was applicable to switch trains in the yards. The plaintiff testified: "We were not supposed to flag in the yard limits on a straight track." The evidence tended to show that the track was straight for more than half a mile where the accident occurred. The plaintiff testified, as quoted in the opinion, in effect, that the rule, meaning, of course, as it reads, "does not make any difference between a curve and a straight track. I made the difference myself." But the plaintiff added: "Everybody around the yard does." The last sentence shows that not only the plaintiff, but all the employés around the yard, understood that the rule was not to be applied in the yard and on a straight track. There was evidence by several other witnesses tending to show that the rule was not applied in practice to the switching of trains in the yard. Again, the evidence shows that the plaintiff under the circumstances could not have gone back to flag the train. When the accident occurred, the train he was on was moving at the rate of six or seven miles an hour. The contention is that he should have gone back before the accident when the switch train stopped. But there is nothing to show that he knew the train would remain stopped more than three minutes. The opinion says that the stop was from "5 to 10 minutes, the several witnesses varying as to the exact time." The conductor, Dunn, testified that it was "in all 4 or 5 or 6 minutes." Testimony as to short periods of

time is very uncertain; and, unless the stop exceeded three minutes, there could be no pretense that it was the plaintiff's duty to go back to flag the train. If material, it would have been clearly a question for the jury as to whether or not the stop really exceeded three minutes. What in one person's mind might be four minutes, in another's might be one minute. "Few persons have just notion of the length of a small space of time." Ram on Facts, 84. The record does not justify the court in holding that the stop certainly exceeded three minutes. When a witness says a stop was "from four to six minutes," a jury might justly find that it did not exceed three minutes. If the facts had been such as to make the rule applicable, evidence of its known habitual disregard would have made it a question for the jury as to whether or not the rule had been waived by the company. Cleveland, C., C. & St. L. Ry. Co. v. Baker, 91 Fed. 224, 33 C. C. A. 468; 1 Labatt on Master and Servant, § 232.

The record does not make it certain how long the switch train had been moving after the stop. After it started at the rate of six or seven miles an hour, it was not practicable then for the plaintiff to flag the approaching train. At the time of the injury, the plaintiff had out and exposed on the rear car his red light. That was all that he could do. Although this statement appears twice in the plaintiff's testimony, corroborated by Allen, the defendant's witness, it is not included in the statement of the evidence in the opinion of the court. The court mentions the fact that the engineer of the Hoodlum train testified that he saw a white light, but no red light, on the switch train. The jury, of course, had the right to believe the plaintiff's statement, even without corroboration.

The question whether the plaintiff himself was free from negligence refers to negligence operating at the time of the injury. That he might have been negligent at some other time would not affect the issue. A. & W. P. R. R. Co. v. Johnson, 66 Ga. 259, 260. The trial court, I think, was clearly right in refusing to direct a verdict on the first ground.

The other reason given in the opinion for holding that the court should have directed a verdict for the defendant is that the plaintiff "could, by the exercise of ordinary care, have escaped from any perilous position in which he might have been placed, and thus avoided his own injuries."

The evidence shows that immediately preceding the collision the plaintiff was busily engaged in the performance of his duties. He testified:

"When the train had begun to move, it was making a noise just like box cars and coal cars will make a noise. I did not hear this train approaching from the rear. I was looking in front for a signal, and, just before he hit me, I reached down to get my lantern to go to the other end of the car I was on and tie up the brake on that old cab and the front end of this coal car, and that is when it happened immediately. I just looked around when I picked up my lantern, and he was within three feet of me, I reckon. I didn't have time to jump or do anything."

The only way in which he could have escaped from his perilous position would have been to jump from the car before the Hoodlum

train struck it. The train rushed on him at the rate of from 25 to 30 miles an hour, and the car he was on was moving at the rate of 6 or 7 miles an hour. Under these circumstances, the trial court would certainly have no right to say arbitrarily that he was in fault for not jumping from the train. If he had jumped and received injuries by jumping, the court would then have had the power, but not the right to arbitrarily instruct the jury that he ought to have remained on the car. In either case, it was clearly a question for the jury as to whether under the circumstances he was in fault. Beach on Contributory Negligence (3d Ed.) § 451 (quoting Judge Cooley); 3 Thompson on Negligence, §§ 3025, 3026; 1 Beven on Negligence (3d Ed.) 156.

The following excerpt from the charge of the able and experienced trial judge shows how fairly he submitted to the jury the controverted questions of fact:

Newman, District Judge, charging the jury:

"At common law the employer was not liable to an employé for the negligence of another employé in the same common service, but by a statute of Georgia this has been changed as to railroad companies. Railroad companies in Georgia are liable to their employés for injuries through the negligence of coemployés in the same service, provided the injured employé is free from fault. In this act of the Legislature of Georgia, it was recited that, on account of the large number of servants employed by railroad companies, this should be the rule, that an employé should be entitled to recover for an injury sustained through the negligence of a coemployé, but the injured party in that sort of a case must be free from fault himself. It will be necessary for you to believe, in this case, that the employés engaged in operating the Hoodlum train were guilty of negligence in running into the rear end of the other train, and, even if this be true, it will be necessary for you to believe, further, that the plaintiff himself was free from fault in and about the matter which caused his injury.

"You will first ascertain whether or not the employés operating the Hoodlum train, and particularly the engineer, were guilty of negligence in that respect. If they were not guilty of negligence, if, under the circumstances, they had a right to assume that the way was clear and to run on as they did, and that there was no negligence on their part in connection with this accident, the railroad company would not be liable and you would find a verdict in its favor.

"If you believe there was negligence on the part of these employés on the Hoodlum train, particularly the engineer, it will be necessary also for you to find that the plaintiff was free from fault.

"The fault claimed on the part of the plaintiff by the defendant is that he failed to flag or protect the rear end of his train when he must have known and seen the Hoodlum train approaching.

"The court instructs you that it would be the duty of the flagman in this position, under the rules of the company and under all the evidence, to use such reasonable care under the circumstances as was necessary to protect the rear of his train. Under these rules and under the common sense of the matter, if a man was placed there, it would almost be a matter of common knowledge that he was placed there for the protection of the rear end of his train.

"If you believe that he was occupying the track of the company at such point that he knew or had reason to believe that another train was following upon the same track, he should have used reasonable care to protect his train from injury from the approaching train.

"In the opinion of the court, so much of the rules of the company, read in evidence, as require the flagman to go back 16 telegraph poles, or 18 telegraph poles, would not be strictly applicable in the yards of the company, because the speed that switch trains attain in the yards, and switch engines, would hardly require that, but it would be necessary, indeed, under all these

rules, it was necessary, for him to exercise reasonable care, in his position, to protect the rear of his train in a proper way."

It is to be noted that the trial judge charged the jury that the rules referred to were not strictly applicable on the facts, and that no exception to this instruction was taken by the defendant. The trial judge evidently recognized, and the defendant did not then controvert, that the evidence tended to show that the company's servants were not required or expected to act under the quoted rules in the yards and under the circumstances of this case.

After the verdict for the plaintiff was rendered, the defendant moved for a new trial. The following are excerpts from the opinion of the judge in refusing the motion:

Newman, District Judge:

"* * * The defense was based almost entirely upon the ground of contributory negligence on the part of the plaintiff. The court submitted this issue distinctly to the jury—that is, as to whether there was any negligence on the part of the plaintiff contributing to the accident which resulted in his injury—instructing them that, if there was fault on his part in this respect, he could not recover, and the jury necessarily found this issue in favor of the plaintiff in order to find a verdict in his favor. * * *

"Considering the character of the work to be done, the location in the company's yards, and the fact that there was a straight track approaching Howell's Station for a considerable distance in the direction the Hoodlum train was coming, I am not prepared to say, in the face of the verdict of the jury, that the plaintiff may not have assumed that his cut of cars, moving off by Howell's Station, with the red light on the rear, could be seen by the approaching engineer, and that he was in no danger whatever from a collision with the Hoodlum train. That Ritch was in the discharge of the duty which he thought he should perform at the time, and about to start to do some work which he thought it was his duty to do, can hardly be questioned from the evidence."

This opinion, rendered by the judge who heard the evidence and saw the witnesses, shows, as I think the evidence in the record also abundantly shows, that the plaintiff's right to have his case go to the jury could "hardly be questioned from the evidence." Excerpts from the evidence appear in a footnote.[1]

When we consider that this court should be governed by the rule announced in Grand Trunk Railway Company v. Ives, supra, it is difficult to see how it can now be held that this case should be reversed for the failure to direct a verdict for the defendant. It cannot be done without violating that rule, unless the facts are such that all reasonable men must draw the conclusion from them that the defendant was entitled to the verdict because of the negligence or fault of the plaintiff. The judge who heard the evidence and the jury to whom the issue was fairly submitted have reached a conclusion on conflicting evidence different from that of the majority of this court, and that result itself should have its weight in showing that there was in the case some evidence to justify their conclusion. Twelve jurors may be "reasonable men," although they draw inferences from the evidence differing from those drawn by two judges.

[1] See note at end of case.

A learned writer who devoted his life to the study of this subject wrote:

"Before venturing to decide a question himself, instead of submitting it to the jury, the judge may well take the opinion of the jury upon it, and, if he finds that opinion opposed to his own, he may well pause and reconsider his own opinion with greater deliberation, upon a motion for new trial, instead of concluding that he is better capable of dealing with questions of fact than the 12 men in the jury box, thus deciding the case under the stress of the supreme thought of the hour." 1 Thompson on Negligence, § 431.

Another distinguished writer, referring to cases involving the issue of negligence, says:

"The American courts * * * have gone to such extreme lengths in controlling and setting aside verdicts that it seems to be often difficult, if not impossible, to acquit them of ignoring altogether the true boundary line be-' tween their own functions and those of juries." 1 Labatt on Master and Servant, § 330.

See, also, 1 Beven on Negligence (3d Ed.) 131.

While this is true of some of the lower federal courts, it is not true as to the federal court of last resort. That court has adhered to the rule announced by Mr. Justice Lamar, which heretofore has been followed by this court. Nelson v. N. O. & N. E. R. Co., 100 Fed. 731, 40 C. C. A. 673; Southern Pacific Co. v. Covey, 109 Fed. 416, 48 C. C. A. 460; Texas & Pacific Ry. Co. v. Carlin, 111 Fed. 777, 49 C. C. A. 605. And one of our greatest judges, deprecating this tendency of the lower courts to take such cases from the jury, said:

"We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others." Jones v. East Tenn., etc., R. R. Co., 128 U. S. 443, 445, 9 Sup. Ct. 118, 32 L. Ed. 478.

Recently, the President, himself once a federal judge, said in a message to Congress:

"Under present conditions the poor man is at a woful disadvantage in a legal contest with a corporation or a rich opponent."

To enlarge the rule allowing the court to take cases from the jury will greatly increase the disadvantage. Plaintiffs of the class in question are rarely able to bear the expense of appeal to a higher court. That the class is numerous is shown by the fact that in only three months of last year 1,080 employés were killed and 33,462 injured by accidents on "steam roads" alone. Accident Bulletin, I. C. C., for July, August, and September, 1910, p. 4. If plaintiffs in such cases, where the evidence is conflicting or the inferences varying, are not allowed to submit their cases to the jury, the evil pointed out by the President will be increased tenfold. Life and limb will appear cheaper to the employers than safe appliances and skillful fellow servants, for to kill and maim by negligence will cost them nothing. Whenever the Circuit Court improperly and unjustly takes the case of an indigent plaintiff from the jury by arbitrarily directing a verdict

against him, he is practically denied the constitutional right of trial by jury.

In my opinion the trial court ruled correctly in refusing to direct the verdict, and the judgment should be affirmed.

## NOTE.

Clifford H. Ritch, the plaintiff, as a witness in his own behalf, testified:

"I am the plaintiff in this case. On the 16th day of December, 1908, I was employed as a switchman by the Southern Railway in the yards—at the Inman yards. * * * On this particular occasion, when I was hurt, I rode the rear end of these cars, didn't use any air, and we just coupled up to the cut of cars. Sometimes on four or five cars we cut the air in, and sometimes we didn't cut any in at all, carried them without any air on them, and I stayed on the rear end. * * * In this particular case I was back there on the rear car, on a coal car, one of these hopper bottom coal cars, and my white lantern was on the end of the sill on the right-hand side, and my red light was on this side going north. It was near 5 o'clock in the morning. I guess it was about daybreak. There wasn't any brake on the end of the car I was on, and I reached down to get my lantern to go to the other end of this car to put the brake on the cab, and this coal car—there was an old can on the end next to this coal car—and when I reached for my lantern, this man hit me like that. Conductor Jim Dunn had control of the train, and directed its movements. In this particular case he gave directions about cutting the engine off and letting these cars run down the grade. At this particular time my duty was to get off at this switch that was thrown for letting the cars up there and throw the switch and get my engine out of there, and go up to where the train stopped at, wherever it stopped, generally stopped at Howell's Station, and couple the engine to the end of the cars I was on, and shove those cars in that position, and the front switchman stayed up in front, and the conductor both and I would stand on the nearest box to the engine and watch out for signals in shoving the cars in. When the engine cut loose, it was on the front of the train. It cut loose and went one way, and the train just ran on by gravity on the other track. The engine was to come back and couple on to the rear end of the train after it got up by the engine. When the collision took place, I was on the rear end of that coal car. I was on the end sill on the outside, on the end sill. That coal car sill is about that width, I suppose [indicating]. * * * I had a red light and a white light on this car. The red light is to signal danger and the white light is to give signals with, pass signals from one to the other. The Hoodlum car came from the rear. We were both going in the same direction, and he overtaken us. The Hoodlum was on the north-bound passenger track. It was used for freight engines and all things. The Hoodlum train is a train that carried employés from Simpson street to North Inman and all places between. It carries just employés. It is composed of from one to three cars, hardly ever over two; and engine and one to three cars, sometimes passenger coaches, and sometimes baggage cars. On this occasion they were pulling two passenger coaches. It does not run on a schedule, just a bulletin put up and the train makes a round trip. It makes a round trip about every hour, all night and all day. It runs from Simpson street to North Inman yards, something like six or seven miles. Conductor Maddox was in charge. Wilkie was engineer of this train. It started from South yards to Inman yards. It was all within the yard limits of Atlanta. The yard limits are supposed to extend outside of the road. This train looks out for obstructions no more than freight engines that are working in the yard limits. This train is not on the time table at all, and never has been. It is a little train run for the convenience of the employés of the yards. It was going in the same direction my cars were. It was a tail-end collision on the same track. We were in front, and he came up from the rear and hit me. I was on the back the way they were going. He came up behind me. I can make a rough diagram of the station there, so the jury can understand better. * * * In the yard limits they are sup-

posed to run under full control through the yard limits, if you can't see a
train over three car lengths, if you are in any place, around a curve or
any place where you can't see a train over three car lengths. They are sup-
posed to run so as to stop within the distance they can see a train in front
and any danger. * * * The Hoodlum train ordinarily made a round
trip every hour. That was what was on the bulletin that was to give em-
ployés. It always ran within yard limits. It had no schedule, only just
running time and leaving time at each end. As to what I had to do under
my duties to indicate to this Hoodlum train or a switch engine or any other
train on the track that I was there, my red lamp was there to show, and
this track was perfectly straight, and he could see me there for near half
a mile. From the point where I was struck the track was straight back
for half a mile. You could see half a mile, perfectly straight. This train is
not supposed to run at a higher rate of speed than to have perfect control
of the engine. They run under control so as to stop in the distance they
can see a red light. When my engine cut loose and the cars were going
down the track, I suppose they was running about six or seven miles an
hour. They were going by force of gravity; about like a man would trot,
something like that. After the engine cut loose, the cars rolled just about
as far as from. here to the back of the building. before the Hoodlum train
struck us. The Hoodlum train must have been running at the rate of 25
miles an hour, 25 or 30 miles. When the cars were hit, I was on a cut of
27 cars, and he came very near knocking the front switchman off of the
twenty-seventh car from where he hit back here, and knocked this coal car
crossways of the track, kind of catty-cornered,, and knocked 'his tender right
up against his boiler, hit right jam up against it. The right side of the
tender was up against the boiler. One car was derailed. That was the car
I was on, and his tender was knocked off. The car I was on was an empty
car. It was thrown across that track, knocked crossways, kind of catty-
cornered across. I could not see the front brakeman at the time we were
hit. I was knocked down through that car some way. I could not tell
exactly. When the train hit, I was knocked down on my back, fell with
my back across these two axles, rear axles of that coal car. My head
was on the ground, and there was a hole knocked in the end of the tank
about that large [indicating] in the water tank on the tender, and the water
came out of that tank on me. * * * I saw that after I got up. I was
knocked senseless. I didn't know anything about the water being on there
until just before this. I was out of breath. I could not tell how long I
was there on the ground before they found me. When I recovered my
senses, I was in that same position, lying on the ground, across these axles
with my head on the ground. The frame of the car was knocked up. It
was knocked off of the axles, and I was lying flat on my back on these
axles, and my head on the ground. I was that way when I recovered my
senses. Maddox was the first one that got to me when I recovered my senses.
I don't recollect any one else. He was the conductor of the Hoodlum. Him
and Jim Dunn got me in the car and laid me down on the seats, and I couldn't
lay in that position, and they took me off, and they got a switch engine
there and put a cushion on the front end of the switch engine, and laid
me down on that. Then they brought me to Simpson street, and telephoned
for the ambulance, and sent me to the Atlanta Hospital. I stayed there 30
days, I think. I was injured in the small of my back, this right side, one
rib over my heart and this foot [indicating]. One rib was crushed in some
way. The doctor can tell you how it was. These ribs here in the right
side. The skin underneath them was cut loose, and they were knocked out
of joint. I couldn't say exactly which, on that side. My right foot was
crushed and that calf was hurt. The skin shows that, that was split in
three places and that torn loose, and my foot was crushed back that way
[indicating], and that big toe there was crushed all to pieces. When I got
to the hospital, I was conscious. I suffered pain. The pains in my back
were awful, and in my right side, and back up in my chest. Why, my back,
you know, pains me now, pains me awful. At times my back pains me awful
bad and at times it does not bother me at all scarcely, and my right side
and just up in here [indicating] gives me some pain sometimes, but the

pain there is not as bad as the pain in my back. This right foot, the leaders in this leg, I suppose was torn somewhat, and right up and down that muscle aches there in that leg when I stand on it or walk on it too much; and, of course, the foot is stiff. * * * When I was on this end sill, there was nothing between me and the track, and I had a red light there to keep trains and people from running into us. They provide a flagman with a lantern of that sort. I was supposed to take charge and protect the rear of that train, and was given that lantern to do it; but I was not supposed to flag a train there on that straight track. We weren't supposed to flag down there. We were not supposed to flag in the yard limits on a straight track. In the yard limits, if my train is standing on a curve, I always step back around to give the man a showing, but on a straight track when he could see what is the use of flagging if a man can see, in the yard limits. The rules make double protection for that very thing. The fact that they could look out. There is a rule covering that. The rule covers flagging, where he should use the flag when occupying the main line. It does not make any difference between a curve and a straight track. I made the difference myself. Everybody around the yard does. The rule says that, when we are occupying the main line, there is a certain distance to go back to flag, but we don't flag according to that rule in the yard limits. In the yard limits the rules on the time tables supersede that rule. Those rules on the time table supersede the other rules, the general rules. There is a special rule there. * * * I was on the main line, but at the time I was hit I was running. The rules do not require us to put down a torpedo or fusee in the yard. * * * Why, the train was moving and on a perfectly-straight track, and nothing in the way to keep the engineer from seeing my light, nothing in the world between us and his tender, and I was just so sure that he would stop, knew that he would stop. It was a stop station for all trains. It is a stop station for all trains. Switch engines and all other trains stop there. * * * When the train had begun to move, it was making a noise just like box cars and coal cars will make a noise. I did not hear this train approaching from the rear. I was looking in front for a signal, and, just before he hit me, I reached down to get my lantern to go to the other end of the car I was on and tie up the brake on that old cab and the front end of this coal car, and that is when it happened immediately. I just looked around when I picked up my lantern and he was within three feet of me, I reckon. I didn't have time to jump or do anything."

W. W. Watts, yardmaster, a witness for the defendant, testified:

"It was not necessary that a flagman operating in the Atlanta yards on the rear end of a train of that sort, pulled by a switch engine for the mere purpose of switching around, to run back every time the train stops three minutes to put out a fusee or torpedo. They do it; yes, sir; they do. For a three minute stop they set their fusee for it, set it up. If a switch train stops as many as five or six times in going from the South yard to Howell's Station, for the flagman to observe the rule he does not have to run back 18 telegraph poles and put out a fusee or torpedoes. They have to take a red light, and go back from the end of the train some distance. If they are in the yard limits, the instructions are he would go back to flag with his red light. If the train did not stop more than two or three minutes, if he would go back with his red light, he could stop anybody that was coming. * * * As a matter of practice in operating these switch engines in the yards, the flagman every time the engine stops three minutes to switch cars or anything else does not run back with the red light, but they do get down on the ground and go back far enough from the rear of the train. The distance they go back depends on the curve of the track. From Howell's Station back this way for half a mile there is a perfectly straight track over to Simpson street. Then you get a curve to the right, and at the A., B. & A. crossing you strike a curve to the left. Beyond the A., B. & A. crossing, going north, from there to Howell's Station, the track curves from the A., B. & A. crossing to Jefferson street. I would not call it a straight track till you got 50 or 75 feet going north of the A., B. & A. crossing. It is nearly a half mile to Howell's Station. That is per-

fectly straight. This Hoodlum train makes 8 or 10 stops in 5 miles, and had 30 minutes to get there and run round his train in. I suppose he ran upwards from 20 or 30 or 35 miles an hour in the yards. In some places he would not have to run over 20 miles an hour to make his stops and other places run 35 miles."

J. T. Dunn, the conductor on the switch train, and a witness for the defendant, testified:

"I am employed by the Southern Railway Company. I was in charge of the train that Mr. Ritch was working with when he was hurt in December, 1908. Just before his injury, I stopped there to drop my train by at Howell's Station. My engine was standing right at the stop board at Howell's Station. I had in the train 27 cars. My train extended back 27 car lengths. The cars run anywhere from 32 to 38 feet each. There was air on my train—about 15 cars with air. When I stopped there, I had to bleed the air off these cars before I could drop them by. In pulling down there, we had to cut the air loose from the engine, and had to bleed the air off. I had to cut the engine off and cut off this air, and after I cut it off, I had to bleed the cylinders before they would roll in. Cutting the air out sets the brakes on the cars. To do that there is a little lever on the cars connected with these air cylinders, and you have got to catch this and pull it and open the air cocks to the cylinders and blow the air off to release the brakes. I have to wait until the air goes out. My head brakeman and I did that. I suppose it took four or five or six minutes to do that work. After I bled this air off, I walked down in front of the engine. The engine was going backward, and I was in front of the engine the way we were going, and made arrangements with the switch tender as to what I was going to do, and then gave my switchman lantern signal to give the cars a start and cut the engine off, and I was to let the engine go down the straight main line, and turn the cars in the other main line. I stopped at Howell's before those cars got started, in all four or five or six minutes. I was standing there making this till we got ready to start the train again at least five minutes. The train at that time was on the north main line. I was blocking the main line during that five minutes. I did not see Ritch at the time. He was on the rear of the 27 cars. After I started my train and cut the engine off, C. C. Rogers cut the engine off, and I was to turn the engine at the switch myself, and then cut the cars, with Rogers off. The engine went by and Rogers came on the train. I cut the train, and I thought I heard something hit my train just after we started, and I said, 'Didn't the Hoodlum hit our train up yonder?' and he said, 'Something hit us,' and after the cars came rolling on down, why I got up on the cars with him and helped him to stop the cars after they rolled into the clear. I did not see Ritch from the time I stopped the cars up until that time. I did not know whether he had been out to flag or not. * * * Every time we stop now within the Atlanta terminal limits we expect the switchman or flagman, whatever he is called, to be ready in case he could see or hear anything coming to go back at once. I don't expect him to go back at all unless he sees or hears some one coming. It wasn't the rule. If it was a straight track, he could have seen anything coming far enough. As to the engineer on the train seeing our train, too, it was very foggy that morning. There was a tolerably heavy fog that morning. It was tolerably cold. It was in December. The engineer did not give any signal for Mr. Ritch to come back to the train on this occasion. They hadn't yet gotten rid of the load. The stop we made there did justify in my opinion the flagman going back and leaving the train to do flagging. He should have gone back far enough to stop a train. We would have blown him in before we left there if he didn't come in of his own accord. The Hoodlum train didn't hit my train until it started off. I didn't blow him in, because we hadn't coupled the engine on the train to leave. The train was going, but, before I uncoupled the engine, I gave the train a jerk. The flagman on the front uncoupled the engine from the cars. Then the engine ran on. The cars rolled straight on, going downgrade. I did not blow the switchman in at that time because we had yet, you know, to bring the engine back on the main line and put it in on the freight line."

W. H. Allen, the engineer on the switch train, and a witness for the defendant, testified:

"I know we were there six or seven or ten minutes. It takes that long to bleed 16 air cars. I saw the rear signal on my train when we left the A., B. & A. crossing, red light. My train was 27 cars long."

H. S. Wilkie, the engineer on the Hoodlum train, and a witness for the defendant, testified:

"I did not see this train that I struck till I was about two car lengths off, something like that. I was looking ahead at the time. I saw a white light in the direction I was going. I did not see a red light. This white light was sitting on the end of a car on the end sill. It was on the right of the car, I guess, from me. I thought the light was on the W. & A. tracks. My train had right of track while I was running there over everything except passenger trains. This I struck was not a passenger train. I had right of track over it. A red light signifies danger. It is the danger signal. This was a straight track where I struck the cars."

Mr. Rountree, of counsel for the plaintiff, offered page 182 of the rule book in evidence, and read it to the jury, as follows:

"General Regulation 1. Yard limits are indicated by sign boards, reading yard limit located on either side of certain named stations as mentioned in the current time table of each division. Switching and other engines and trains may work within these limits without regard to second-class and inferior trains, but must give way immediately upon their approach. Second-class and inferior trains must approach and run through yard limits under full control, expecting to find the main track occupied. In case of accident responsibility rests with approaching train."

